IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
5:13-CR-138-FL

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | **MEMORANDUM AND** |
| | ) | **RECOMMENDATION** |
| KENNETH LAMONT BARNES, | ) | |
| | ) | |
| Defendant. | ) | |

This case comes before the court on defendant's motion to suppress (D.E. 21), which includes an incorporated supporting memorandum and was accompanied by one exhibit (D.E. 21-1). The government filed a response in opposition accompanied by two exhibits. (D.E. 27-1, -2). The motion was referred to the undersigned for an evidentiary hearing, and a memorandum and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). (*See* 3rd D.E. dated 15 Oct. 2013). For the reasons stated below, it will be recommended that defendant's motion be denied.

## PROCEDURAL BACKGROUND

On 8 May 2013, defendant was charged by indictment (D.E. 1) with possession of a firearm (*i.e.*, a Taurus .45 caliber semiautomatic handgun) by a convicted felon on or about 27 December 2012 in violation of 18 U.S.C. § 922(g)(1). On 16 September 2013, defendant filed the instant motion. It seeks suppression of all evidence taken during a search of defendant's person following a stop of a vehicle in which he was a passenger. The undersigned conducted a hearing on the motion on 13 November 2013. (D.E. 34). At the hearing, the government presented the testimony of two detectives with the Raleigh Police Department ("RPD") who were involved in the events in question: Detective J.W. Ladd ("Ladd") and Detective W.E. Nordstrom ("Nordstrom"). (Transcript of Hearing ("Tr.") (D.E. 36) 4:4-6; 4:24 to 5:3; 27:11-

14).  The court also admitted two exhibits (*see* Hrg. Ex. List (D.E. 35)) offered by the government, without objection by defendant, as follows:  a 2 October 2012 CrimeStoppers report (Ex. G1; Tr. 36:7-20) and a 17 October 2012 search warrant issued by a Wake County, North Carolina magistrate (Ex. G2; Tr. 33:19 to 34:20).  Defendant did not present any evidence at the hearing.  The one exhibit submitted with his motion consisted of the investigative reports of Nordstrom, Ladd, and Robert M. Fleer, an officer on a task force of the Federal Bureau of Alcohol, Tobacco, Firearms and Explosives.  While defendant did not move to admit this exhibit at the hearing, the government did not object to its inclusion in the record.

## FINDINGS OF FACT

After careful consideration of the relevant evidence of record, the court makes the following findings of fact:

### I.  Tips Received by the RPD regarding Privette

At 7:43 a.m. on 2 October 2012, an anonymous tip related to Antwon Privette ("Privette") was submitted to the RPD through its CrimeStoppers website.  (Ex. G1 at 1; Tr. 34:25 to 35:5; 37:10-23).  The individual providing the tip ("tipster") stated in part as follows:

> Antwon Privette sells crack cocain [sic] in this area, i see him everyday [sic] on idlewild. He gets dropped off at a house on idlewild every morning around 7-7:30am by his girlfriend Deirdra Archie ["Archie"] who drives the burgundy cadillac eldarodo [sic].  I know this information because I see him on idlewild everyday [sic].  He has been selling drugs in that area for a long time.

(Ex. G1 at 1).  The tipster provided the following additional information about Privette:  his physical description; his home address of 3924[1] Hylton Drive in Raleigh; his alias "Tattoo"; his gang affiliation "og, blood"; and additional details regarding the Cadillac Eldorado ("Cadillac") driven by Archie.  (*Id*.).

---

[1] While the address number was redacted from the CrimeStoppers report that was admitted into evidence at the hearing on the motion to suppress, the number is referenced elsewhere in the public record for this case. (*See, e.g.,* Ex. 1 (D.E. 21-1) to Def.'s Mem. 1, 3, 7; Gov.'s Resp. 6; Tr. 38:13-23)

The CrimeStoppers report also indicates that the RPD investigated the tip and confirmed some of the information in it as follows:

> Investigative efforts indicate that Deirdre Samone Archie (DOB [redacted]) owns the 1998 Cadillac Eldorado that the tipster described (active NC registration [redacted] 2228) and a 2001 Mercedes S500 sedan (active NC registration [redacted] 8584). Those vehicles are registered to [redacted] Hylton Drive in Raleigh.
>
> Suspect Antwon Privette (DOB [redacted]) has a significant criminal history and is a well documented UBN gang member.

(*Id.*; *see also* Tr. 38:4-14). The report further indicates that the investigating agency for this tip was the RPD drugs and vice unit. (Ex. G1 at 2).

Nordstrom also received information from a confidential source[2] that Privette was stashing his supply of drugs at the Hylton Drive apartment. (Tr. 42:16 to 44:4; 62:15 to 64:4; Mot. Ex. 3[3]).

## II.   Nordstrom's Training and Experience

At the time of the relevant events, Nordstrom had been an RPD officer for approximately 12 years and was assigned to the drugs and vice unit. (Tr. 27:21 to 25-8; Ex. G2). Prior to this assignment, he served on the career criminal unit, which dealt primarily with drug- and gun-related offenses. (Tr. 28:16-22; Ex. G2 at 4[4]). While assigned to this unit, he was a member of the Federal Bureau of Investigation's Safe Streets Task Force, which conducted extensive drug and gun investigations. (Tr. 28:20 to 29:1; Ex. G2 at 4). He also previously served on the RPD

---

[2] While Nordstrom identified this source as "anonymous" in his report (Mot. Ex. 3), he testified at the hearing that the source was known to him, and, therefore, better described as a confidential source (Tr. 62:15-24). Further, in response to a leading question during cross-examination, Nordstrom testified that in his report he did not identify this confidential source as separate from the CrimeStoppers tipster. (Tr. 63:7-9). Despite this testimony, the court does not interpret Nordstrom's report as indicating that the information came from a single source, and, therefore, finds the report consistent with his testimony that there were two sources–the CrimeStoppers tipster and the confidential source.

[3] Page citations to this exhibit are to page numbers assigned by the court's CM/ECF electronic filing system.
[4] Page citations to this exhibit are to page numbers assigned by the court's CM/ECF electronic filing system.

fugitive unit locating persons with outstanding arrest warrants for mostly violent crimes. (Tr. 40:19 to 41:2; Ex. G2 at 4). In addition, Nordstrom has made numerous drug- and gun-related arrests as a patrol officer. (Tr. 29:5-6).

During his career, Nordstrom has made more than one hundred arrests for drug- and gun-related offenses. (Tr. 29:7-12; Ex. G2 at 5). He has received formal training in identifying persons involved in possessing and selling drugs as well as unlawful possession of firearms. (Ex. G2 at 4-5). As a result of his extensive street experience and training, Nordstrom is familiar with the characteristics of drug-, gun- and gang-related crime. (*Id.*). He is also specifically familiar with the practices of persons involved in the manufacturing, sale, and distribution of illegal controlled substances. (Ex. G2 at 5).

### III. Nordstrom's Prior Experience with Privette

Nordstrom has known Privette for many years based on his work in the foregoing units. (Tr. 29:19-21). Specifically, while assigned to the fugitive unit, he was tasked with locating Privette when there was an active warrant for his arrest. (Tr. 29:23 to 30:1). While Nordstrom was assigned to the career criminal unit, Privette was designated as a target due to his extensive criminal history. (Tr. 42:1-15). At the time of the events in question, the drugs and vice unit was investigating Privette for drug activity. (Tr. 8:21 to 9:4; 28:5-8). Having reviewed Privette's record, Nordstrom was aware of Privette's criminal history, which included drugs and violent crimes, including robbery. (Tr. 41:3-11). Nordstrom was also familiar with Privette's particular pattern of criminal behavior, which involved robbing other drug dealers of their drugs or money. (Tr. 41:13-16).

**IV.    Nordstrom's Investigation and Search of an Idlewild Avenue Address**

On 17 October 2012, a little over two months prior to the investigatory detention at issue in this case, Nordstrom encountered Privette during a drug investigation he was conducting. After a controlled purchase of crack cocaine that day, Nordstrom followed the subject dealer to a house at 106 Idlewild Avenue. (Tr. 30:2-31:1). The Idlewild Avenue area is a high crime area. (Tr. 40:6-9). When Nordstrom approached the house to conduct a "knock and talk," he observed Privette walking down the driveway and noticed a strong odor of marijuana coming from behind the house. (Tr. 30:24 to 31:6; Ex. G2 at 6). Privette admitted to smoking marijuana in the driveway. (Ex. G2 at 6). Nordstrom also observed the Cadillac described in the CrimeStoppers report parked behind the house. (Tr. 30:24 to 31:6; 39:7-14). Nordstrom had previously observed Privette driving the same Cadillac in the Idlewild Avenue area and, in fact, had observed him driving it just prior to Nordstrom's arrival at the Idelwild Avenue house that day. (Tr. 39:22 to 40:3; Ex. G2 at 6). Nordstrom had also observed the Cadillac parked in front of the Hylton Drive apartment. (Tr. 40:45). While speaking with a female who answered the door at the house, Nordstrom detected a strong marijuana odor. (Tr. 31:4-9; Ex. G2 at 6).

Based on information obtained during the investigation, Nordstrom applied for and received a search warrant for the house and vehicles, including the Cadillac, at 106 Idlewild Avenue. (Tr. 31:6-9; 33:23 to 34:4; Ex. G2). When Nordstrom returned to the house later that day to execute the warrant, Privette was still present. (Tr. 31:11-13). During the search, the officers found a small amount of marijuana in the house, but nothing in the Cadillac or the other vehicles searched. (Tr. 31:16-19). However, they were unable to search dog houses located behind the residence because of aggressive dogs chained to the houses. (Tr. 31:20 to 32:9). In

Nordstrom's experience, drug dealers use dogs in this manner at locations where they stash their drug supply. (Tr. 32:11-19).

**V.     Nordstrom's Surveillance of Privette on 27 December 2012**

On 27 December 2012, Nordstrom was on patrol in an unmarked car conducting drug investigations and decided to drive to the apartment at 3924 Hylton Drive to see if he could observe Privette's vehicle at that residence. (Tr. 44:8-18). The Hylton Drive area is a high crime area. (Tr. 40:10-15). It was dark and very cold at the time. (Tr. 9:8-11; 50:10-12). While conducting surveillance from the parking lot, Nordstrom observed a 1998 Silver Infiniti ("Infiniti") enter the apartment complex at approximately 8:45 p.m. and park in a space directly in front of 3924 Hylton Drive. (Tr. 46:9-17; 56:23 to 57:6). The vehicle was occupied by a single male, later identified to be Privette. (Tr. 46:22 to 47:7). The Infiniti bore the same license tag number that Nordstrom had seen previously on the Cadillac, but Nordstrom confirmed that the tag number had been properly switched from the Cadillac to the Infiniti. (Tr. 44:23 to 45:14). Like the Cadillac, the Infiniti was registered to Archie. (Tr. 45:12-14). In Nordstrom's experience, drug dealers change vehicles often to avoid police detection. (Tr. 45:15-25).

No one exited the vehicle, and, after approximately 20 minutes, Nordstrom observed a dark-colored BMW enter the parking area and park in a crooked manner in a row of parking spaces directly behind the space where the Infiniti was parked. (Tr. 47:8-12; 48:23 to 49:4; 66:8-15). With the headlights still on and the engine still running, a black male, later identified as defendant, exited the BMW and began to walk toward the breezeway to 3924 Hylton Drive. (Tr. 15:1-4; 49:4-8). When Privette honked the horn of the Infiniti, defendant changed direction and approached the Infiniti on the driver's side. (Tr. 49:14-24). Defendant then got into the front passenger seat of the Infiniti and closed the door. (Tr. 49:25 to 50:7). After observing the car for

approximately five minutes to determine if it was going to move, Nordstrom contacted his sergeant, who told him to contact Detectives Ladd and Battle for assistance. (Tr. 50:14-24).

## VI. The Investigatory Detention of the Infiniti

Nordstrom called Ladd and explained that he believed that Privette was in the car conducting a drug transaction. (Tr. 9:5-7; 51:3-7). Nordstrom further notified Ladd that he would like to conduct an investigatory detention of the vehicle. (Tr. 51:7-10). Ladd and Battle, who were traveling in the same vehicle, arrived at the scene approximately 5 to 10 minutes later. (Tr. 9:14-21; 51:13-16). The occupants of the Infiniti had remained inside. (Tr. 19:16-14; 26:2-4). Battle, who was driving, approached the driver's side of the Infiniti in his vehicle, and Nordstrom approached the passenger's side in his own vehicle. (Tr. 10:13-16; 19:5-12; 25:11 to 26:4). The detectives' vehicles were positioned less than 15 feet from the Infiniti and in a manner that would prevent the Infiniti from exiting. (Tr. 26:8-19).

Ladd and Battle then exited their vehicle and approached the driver's side of the Infiniti while Nordstrom exited and approached the passenger's side. (Tr. 10:13-16; 52:22-25). Nordstrom initially approached the vehicle with his weapon drawn and held low, but holstered it after moving closer to the vehicle and observing nothing suspicious. (Tr. 52:22 to 53:6). The detectives, who were clearly identified as Raleigh police detectives on the tactical vests they were wearing, announced their presence and directed the occupants of the vehicle to keep their hands visible. (Tr. 20:22 to 21:1; 61:5-9; Mot. Ex. 3-4). Nordstrom then directed the passenger to open the car door and, when it opened, both he and Ladd detected a strong odor of marijuana coming from inside the vehicle. (Tr. 12:15-24; 13:7-10; 53:16-21). Nordstrom instructed defendant to keep his hands visible and to step out of the vehicle, which he did. (Tr. 54:10-12; Mot. Ex. 4). He then asked defendant if he had anything illegal on his person, to which

defendant responded that he had a gun in his right back pocket. (Tr. 13:13-16; 54:14-16). Nordstrom retrieved the gun, handed it to Ladd, placed defendant in handcuffs, and conducted a search of his person. (Tr. 13:17-20; 54:18 to 55:7).

## **APPLICABLE LEGAL PRINCIPLES**

The Fourth Amendment to the United States Constitution protects "against unreasonable searches and seizures." U.S. Const. amend. IV. While "not all personal intercourse between policemen and citizens involves 'seizures' of persons," when "a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." *Terry v. Ohio*, 392 U.S. 1, 16, 19 n.16 (1968). However, "an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (citing *Terry*, 392 U.S. at 30); *see also United States v. Williams*, No. 11-4414, 2011 WL 4866760, at *1 (4th Cir. 14 Oct. 2011). "Investigatory stops are also permissible if the officers act on a reasonable suspicion that the person stopped was involved in a completed crime." *United States v. Basey*, 816 F.2d 980, 988 (5th Cir. 1987). Further, if an officer believes that the person is armed, he may pat the person down, or "frisk" him, for weapons. *Terry*, 392 U.S. at 30.

"'The reasonable suspicion standard is an objective one, so we examine the facts within the knowledge of [the officers] to determine the presence or nonexistence of reasonable suspicion.'" *United States v. Powell*, 666 F.3d 180, 186 (4th Cir. 2011) (quoting *United States v. Digiovanni*, 650 F.3d 498, 511 (4th Cir. 2011); *see also United States v. Foreman*, 369 F.3d 776, 781 (4th Cir. 2004). "The determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior, and it is measured by the totality of the circumstances." *Powell*, 666 F.3d at 186 (internal quotation marks and citations omitted). The

reasonableness of suspicion must be measured by what the officers knew before they conducted the stop. *See id.* (citing *Florida v. J.L.*, 529 U.S. 266, 271 (2000)); *see also Williams*, 2011 WL 4866760, at *1 ("Whether there is reasonable suspicion to justify the stop depends on the totality of the circumstances, including the information known to the officers and any reasonable inferences to be drawn at the time of the stop.").

When, as here, a defendant's motion to suppress challenges the constitutionality of an investigatory stop, the government has the burden to prove by a preponderance of the evidence that the stop was lawful. *See United States v. Cauthen*, 669 F. Supp. 2d 629, 633 (M.D.N.C. 2009) (citing *Coolidge v. New Hampshire,* 403 U.S. 443, 454-55 (1971)); *see also United States v. De La Fuente*, 548 F.2d 528, 533 (5th Cir. 1977). "[A]lthough the standard of proof 'is obviously less demanding than that for probable cause,' the government 'must be able to articulate something more than an inchoate and unparticularized suspicion or hunch.'" *Powell*, 666 F.3d at 186 (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). The Fourth Amendment requires the suppression of evidence that is the fruit of an unlawful stop. *United States v. May*, No. 10-4053, 2011 WL 4379301, at *3 (4th Cir. 21 Sept. 2011) (citing *Wong Sun v. United States*, 371 U.S. 471, 484 (1963)).

## ANALYSIS

The sole issue before the court is whether the government has shown that the information Nordstrom had prior to the detention of Privette's vehicle was sufficient to create reasonable suspicion. While defendant included in his memorandum an argument addressing whether the conduct of the officers constituted an investigatory detention that required reasonable suspicion, the government has conceded this point. (Tr. 72:4-14). Specifically, the government agrees that the investigatory detention occurred at the time the officers positioned their cars to block any exit

by the Infiniti. (Tr. 72:4 to 73:3.). Accordingly, the relevant facts for the court's analysis here are those leading up to the point at which the detention began. *See United States v. Johnson*, 415 Fed. Appx. 495, 500 (4th Cir. 2011) ("Whether there is reasonable suspicion to justify the stop depends on the totality of the circumstances, including the information known to the officer and any reasonable inferences he could have drawn *at the time of the stop*." (emphasis added)).

The information known to Nordstrom prior to initiating the detention of Privette's vehicle includes the following:

During his more than a decade of service with the RPD, Nordstrom became personally familiar with Privette and his significant criminal history, which included drug offenses. *See United States v. Powell*, 666 F.3d 180, 188 (4th Cir. 2011) (recognizing the well-established principle that a person's prior criminal activity is a relevant factor in establishing reasonable suspicion). The information provided from the CrimeStoppers tipster and another confidential source indicated that Privette was currently involved in drug dealing activity at an Idlewild Avenue location−a high crime area−and that he was stashing his drugs in the woods behind the Hylton Drive apartment−another high crime area. *See United States v. Sprinkle*, 106 F.3d 613, 617 (4th Cir. 1997) ("'[A]n area's disposition toward criminal activity is an articulable fact' that may be considered along with more particularized factors to support reasonable suspicion." (quoting *United States v. Moore*, 817 F.2d 1105, 1107 (4th Cir. 1987))); *see also United States v. Wright*, 856 F. Supp. 2d 736, 742 (E.D.N.C. 2012) (noting that the fact that an area is a "high crime area" is relevant when determining reasonable suspicion). This information was significantly corroborated when a drug investigation being conducted by Nordstrom led him to a house on Idlewild Avenue where he encountered both Privette, who was smoking marijuana, and the Cadillac−a car which he had seen Privette drive and was identified in the CrimeStoppers tip.

Notably, the information gathered by Nordstrom at this point in the investigation was sufficient to support a warrant to search the Idlewild Avenue house, the execution of which resulted in the location of a small amount of marijuana.

It is against this backdrop of Nordstrom's extensive experience in drug investigations and his particular knowledge of Privette's significant criminal past and current suspected drug dealing, that Nordstrom began his surveillance of the Hylton Drive apartment. He observed a car, bearing the same license plate number as the Cadillac, park in front of the apartment where Privette was known to live with Archie and where it was reported that Privette stashed his drugs. From his experience in drug investigations, Nordstrom believed the transfer of the tags from the Cadillac to the Infiniti suggested that this was done to avoid detection by police. Because Privette was present during the search of the house and vehicles at Idlewild Avenue, he would know that the police had established a connection between him and the Cadillac. This would give Privette a motive to change the car he drove. Based on this information, the court finds that it was reasonable, at this point, for Nordstrom to believe that Privette was the driver of the Infiniti. *See United States v. Arvizu*, 534 U.S. 266, 273 (2002) (holding that in formulating reasonable suspicion, officers are permitted "to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" (quoting *United States v. Cortez*, 449 U.S. 411, 418 (1981))).

Defendant's challenge to the detention relies heavily on the fact that Nordstrom was unable to make a direct observation of the driver of the Infiniti. But because "reasonable suspicion 'does not deal with hard certainties, but with probabilities,'" an officer's articulated facts are not required to "eliminate every innocent traveler in order for reasonable suspicion to

exist." *United States v. McCoy*, 513 F.3d 405, 413 (4th Cir. 2008) (quoting *United States v. Sokolow*, 490 U.S. 1, 8 (1989)). Here, the only two people that one could reasonably assume was driving the Infiniti would be either Archie, to whom the vehicle was registered, or Privette, who lived with Archie and had been seen driving the Cadillac with the same license tags. The court concludes that these facts eliminate virtually all innocent travelers except for Archie.

Nordstrom's further observations during his surveillance suggested that Privette was in the Infiniti for the purpose of conducting a drug transaction. Following its arrival, Nordstrom observed that, despite it being a cold night, the occupant did not exit the vehicle for a period of 20 minutes and that the engine remained running, indicating that the occupant had no immediate intention to exit. The fact that defendant arrived after this period and was redirected from the apartment to the parked Infiniti gave the appearance that a meeting had been arranged between defendant and the occupant of the Infiniti. The manner in which defendant parked his vehicle–haphazardly, engine running, lights on–further suggested that he was there for a relatively brief encounter, such as a drug transaction. Moreover, the Infiniti did not depart with defendant, but remained stationary with both occupants still inside up until the time the detention was initiated by the officers approximately 10-15 minutes later. The court concludes that the combination of the above facts constitutes reasonable suspicion that a drug transaction was occurring in the Infiniti.

While defendant asserts that the information from the tips did not contain sufficient predictive information to support reasonable suspicion, such is not the proper legal standard for determining the reliability of information received from an anonymous or confidential source. Rather, the Supreme Court has held that the proper approach for determining whether information from such sources establishes either reasonable suspicion or probable cause is to

consider the "totality of the circumstances." *Illinois v. Gates*, 462 U.S. 213, 238 (1983) (replacing the "two-pronged test" previously applied for determining whether information provided by an informant establishes probable cause with a "totality-of-the-circumstances" approach); *see also Alabama v. White*, 496 U.S. 325, 330-31 (1990) (holding that the "totality of the circumstances" standard established in *Gates* applies in the reasonable suspicion context). The Court in *Gates* further held that "an officer 'may rely upon information received through an informant, rather than upon his direct observations, so long as the informant's statement is reasonably corroborated by other matters within the officer's knowledge.'" *Gates,* 462 U.S. at 242 (quoting *Jones v. United States*, 362 U.S. 257, 269 (1980), *overruled on other grounds by United States v. Salvucci*, 448 U.S. 83, 95 (1980)). The Court also observed that anonymous tips, "particularly when supplemented by independent police investigation, frequently contribute to the solution of otherwise 'perfect crimes.'" *Id*. at 238.

Here, Nordstrom did not base his decision to conduct the investigatory detention solely on the information from the tips. Rather, the tips were used as a starting point for a more than two-month investigation of Privette. During this investigation, Nordstrom independently obtained additional evidence of Privette's suspected drug activities, which further corroborated the information in the tips. Accordingly, the court finds defendant's argument to be without merit.

Finally, defendant holds out the Fourth Circuit's ruling in *Sprinkle* as supportive of his argument that the circumstances here did not provide Nordstrom with reasonable suspicion. He argues that the *Sprinkle* court's conclusion that there was no reasonable suspicion for a stop of a vehicle was based on facts stronger than those presented here. The court disagrees with defendant's analysis.

13

Case 5:13-cr-00138-FL   Document 37   Filed 02/26/14   Page 13 of 15

There are several material differences between the facts in *Sprinkle* and the facts of the instant case. In *Sprinkle*, the court noted the following five factors on which the government relied in arguing that reasonable suspicion supported the stop of the vehicle in that case:

> (1) [The officer] knew that [the driver of the vehicle] had a criminal record and had recently been released from prison after serving time for narcotic violations, (2) the subjects [including defendant] were spotted in a neighborhood known by the officers for high (narcotics) crime, (3) when [defendant] entered the [vehicle], he and [the driver] huddled toward the center console with their hands close together, (4) as [the officer] walked past the car, [defendant] put his head down and his hand up to his face as if to avoid recognition, and (5) [defendant] drove away as soon as the officers walked by the car.

*Sprinkle*, 106 F.3d at 617. Key differences between these facts and those present here are that: (1) unlike the officers in *Sprinkle,* who were aware of the suspect's criminal record and recent release from prison, Nordstrom had personal familiarity with Privette's past criminal behavior and with his current suspected drug dealing activities, *see id*. (noting as material that while the officer knew the suspect had recently completed a sentence for a drug offense, he had "no information that [he] had returned to crime since his release"); (2) Privette was not only parked in a high crime area, as in *Sprinkle*, but also in proximity to his suspected drug stash; and (3) the events here occurred after dark, which limited the opportunity for outside observation and could be exploited for illicit purposes, whereas in *Sprinkle*, they occurred "at 5:30 p.m. on a sunny day," *id.* These distinctive facts, alone, provide greater support for reasonable suspicion than those in *Sprinkle*.

For the reasons discussed above, the court concludes that the totality of the circumstances provided Nordstrom with reasonable suspicion that criminal activity was afoot in the Infiniti at the time he initiated the investigatory detention. Accordingly, the court concludes that the investigatory detention of the car was lawful.

## CONCLUSION

For the foregoing reasons, it is therefore RECOMMENDED that defendant's motion to suppress (D.E. 21) be denied.

IT IS ORDERED that the Clerk send copies of this Memorandum and Recommendation to counsel for the respective parties, who have 14 days or such other period as the court may direct in which to file written objections. Failure to file timely written objections bars an aggrieved party from receiving a de novo review by the District Judge on an issue covered in the Memorandum and Recommendation and, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Judge.

SO ORDERED, this the 25th day of February 2014.

_____
James E. Gates
United States Magistrate Judge