IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:13-CR-138-FL

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | ORDER |
| | ) | |
| KENNETH LAMONT BARNES, | ) | |
| | ) | |
| Defendant. | ) | |

This matter comes before the court on defendant's motion to suppress (DE 21). Pursuant to 28 U.S.C. § 636(b)(1), United States Magistrate Judge James E. Gates issued memorandum and recommendation ("M&R") wherein he recommends that the court deny defendant's motion (DE 37). Defendant timely filed objections to the M&R (DE 36) and the government responded (DE 41). In this posture, issues raised are ripe for ruling. For the following reasons, the court ADOPTS the findings and recommendations of the magistrate judge and DENIES defendant's motion to suppress.

## BACKGROUND

Defendant was indicted on May 8, 2013, with being a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g)(1) (DE 1). On September 16, 2013, defendant filed the instant motion, seeking to suppress all evidence resulting from a December 27, 2012, search of defendant's person after a vehicle stop.

The magistrate judge conducted an evidentiary hearing on November 13, 2013 (DE 34). At hearing the government presented the testimony of Detectives J. W. Ladd ("Ladd") and W. E. Nordstrom ("Nordstrom"), of the Raleigh Police Department ("RPD"). The government also

submitted two exhibits, namely, a CrimeStoppers report dated October 2, 2012, and a October 17, 2012, search warrant issued by a magistrate in Wake County, North Carolina. Defendant did not testify, and an exhibit to his motion to suppress – consisting of the investigative reports of Nordstrom, Ladd, and Robert M. Fleer[1] – was admitted into evidence.

Except where defendant has filed specific objection, the court adopts and incorporates herein the statement of facts contained in the M&R. Briefly, on October 2, 2012, the RPD received an anonymous tip through its "CrimeStoppers" website. The tipster stated that

> Antwon Privette sells crack cocain [sic] in this area, I see him everyday on idlewild. He gets dropped off at a house on idlewild every morning around 7-7:30am by his girlfriend Deirdra Archie who drives the burgundy cadillac eldarado [sic]. I know this information because I see him on idlewild everyday. He has been selling drugs in that area for a long time.

Resp. Opp'n Mot. to Suppress Ex. 1, CrimeStoppers Tip (DE 26-1). Detective Nordstrom had prior experience with Privette during his over ten years with the RPD. Tr. Suppression Hr'g 29-30. Indeed, Privette had been designated as a target during Detective Nordstrom's time with the RPD's career criminal unit due to his extensive criminal history. Id. at 42.

Idlewild Avenue is a high crime area. Id. at 40. On October 17, 2012, RPD officers conducted a controlled buy of crack cocaine from a dealer on Idlewild Avenue. Id. at 30; Resp. Opp'n Mot. to Suppress Ex. 2, Search Warrant at 6 ("Search Warrant") (DE 26-2). Officers, including Detective Nordstrom, followed the dealer back to 106 Idlewild Avenue. Tr. Suppression Hr'g 30. Detective Nordstrom observed Privette at the residence, and also saw the Burgundy Cadillac Eldorado there. Id. at 31; Search Warrant at 4. Detective Nordstrom also smelled an odor of marijuana coming from behind the house. Search Warrant at 6. He then conducted a "knock-and-

---

[1] Fleer is an officer with the Federal Bureau of Investigation's Alcohol, Tobacco, Firearms, and Explosives task force.

2

talk" at the residence to learn more, and spoke with a woman who stated that she lived there. Id. During this time he smelled a strong odor of marijuana coming from inside the house. Id.

Based on the information he observed, Detective Nordstrom applied for and obtained a search warrant for the residence and vehicles. Tr. Suppression Hr'g 31. When officers executed the warrant, they discovered a small amount of marijuana inside the house. Id. at 33. They also found very ferocious pit bulls chained to dog houses, and were unable to search those dog houses because of the dogs. Id. at 32. Detective Nordstrom had previously seen pit bulls used in this manner by drug dealers to protect their drug supply. Id.

At some point prior to December 27, 2012, Detective Nordstrom received a tip from a confidential source that Privette's residence at 3924 Hylton Drive was a possible stash location for his drugs. Id. at 42-44. This source was not a regular informant and Detective Nordstrom had not relied on this source's information before. Id. at 62-63. Police were, however, able to verify that this source personally knew Privette. Id. at 65.

During the evening hours of December 27, 2012, Detective Nordstrom went in an unmarked vehicle to 3924 Hylton Drive to see if he could observe the burgundy Cadillac Eldorado there. Id. at 44. According to Defendant Nordstrom, Hylton Drive was a high crime area.[2] Detective Nordstrom did not see the Eldorado, but observed a Silver Infiniti ("Infiniti") bearing the registration plate that he had previously seen on the Eldorado drive into the apartment parking lot. Id. at 44-45. In Detective Nordstrom's experience, drug dealers tend to switch vehicles often to avoid detection. Id. at 45. Although Detective Nordstrom could not see the driver, it appeared to him to be a male. Id. at 46-47. Detective Nordstrom believed the driver was Privette, and the driver was, in fact, later

---

[2] In the M&R, Hylton Drive was found to be a high crime area; however, defendant objects to this finding.

identified as Privette. Id. at 53. The Infiniti parked in a parking space right in front of 3924 Hylton. Id. at 47.

The temperature that night was very cold. Id. at 9, 50. However, no one exited the Infiniti. Id. at 47. After approximately twenty (20) minutes, a dark-colored BMW drove into the parking lot and parked crookedly across from the Infiniti. Id. at 48-49. The driver, who was later identified as defendant, exited the BMW leaving the engine running, and the headlights on. Id. Defendant approached the breezeway to 3924 Hylton. Id. At that time, Privette honked his horn, and defendant turned around, walked toward the Infiniti, and entered the Infiniti on the passenger's side. Id. at 49-50.

After less than five minutes, Detective Nordstrom contacted his Sergeant, who in turn instructed him to contact Detectives Ladd and Battle for assistance. Id. at 50. Detective Nordstrom called Detective Ladd and told him that he believed he was observing Privette and another individual conducting a drug deal in the Infiniti, and that he would like to conduct an investigative detention. Id. at 51. Detectives Ladd and Battle arrived approximately five to seven minutes later. Id. at 18.

The officers blocked the Infiniti in and approached it on foot. Id. at 26. Detective Nordstrom ordered defendant to open the door. Id. at 12. Defendant opened the door and Detectives Nordstrom and Ladd both detected a strong odor of marijuana emanating from the Infiniti. Id. at 13, 53. Detective Nordstrom then ordered defendant to keep his hands visible and exit the vehicle; defendant complied. Id. at 54. Detective Nordstrom then asked defendant if he had anything illegal on his person, and defendant responded that he had a gun in his back right pocket. Id. Detective Nordstrom retrieved the gun and placed defendant in handcuffs. Id.

**COURT'S DISCUSSION**

A.  Standard of Review

The district court reviews *de novo* those portions of a magistrate judge's M&R to which specific objections are filed. 28 U.S.C. § 636(b). The court does not perform a *de novo* review where a party makes only "general and conclusory objections that do not direct the court to a specific error in the magistrate's proposed findings and recommendations." Orpiano v. Johnson, 687 F.2d 44, 47 (4th Cir. 1982). Absent a specific and timely filed objection, the court reviews only for "clear error," and need not give any explanation for adopting the M&R. Diamond v. Colonial Life & Acc. Ins. Co., 416 F.3d 310, 315 (4th Cir. 2005); Camby v. Davis, 718 F.2d 198, 200 (4th Cir.1983). Upon careful review of the record, "the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1).

B.   Analysis

Defendant has lodged what he styles as three objections to the M&R. As presented, his objections are contentions that, first, his seizure was not supported by a reasonable and articulable suspicion, second, tips received by law enforcement could not support a reasonable suspicion of criminal activity on the part of defendant, and third, this case is not distinguishable from United States v. Sprinkle, 106 F.3d 613 (4th Cir. 1997). Where the second and third objections are subsumed in the analysis of the first objection, the court considers all of these objections together.

Defendant first argues that police had no reasonable and articulable suspicion of any illegal activity on his part, noting that nearly all of the government's evidence related to Privette. Law enforcement may lawfully detain a suspect if they possess "'a reasonable and articulable suspicion that the person seized is engaged in criminal activity.'" United States v. Black, 707 F.3d 531, 539

5

(4th Cir. 2013) (quoting Reid v. Georgia, 448 U.S. 438, 440 (1980)). "In determining whether an officer had reasonable suspicion, we view the totality of the circumstances to determine whether the officer had 'a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" United States v. Griffin, 589 F.3d 148, 152 (4th Cir. 2009) (quoting United States v. Cortez, 449 U.S. 411, 417-18 (1981)).

In this case, most of the evidence put forward by the government regards suspected drug-dealing activity by Privette. This does not, however, undermine the fact that officers also possessed a reasonable suspicion of criminal activity on the part of defendant. Detectives with the RPD suspected Privette of drug dealing, and, more specifically, Detective Nordstrom suspected Privette was engaging in a drug deal with defendant that evening. Assuming for the moment, that based upon the evidence presented Detective Nordstrom's suspicion of Privette was reasonable, his suspicion of defendant was necessarily also reasonable as defendant would be the other party to the drug deal.

Moreover, certain facts regarding defendant contributed to such suspicion of both Privette and defendant. Namely, Detective Nordstrom saw defendant drive into the parking lot where Privette was parked,[3] park crookedly across more than one space, and exit his vehicle leaving the lights on and the engine running. When Privette honked, defendant turned, approached the Infiniti, then entered the passenger's side. And despite it being a cold night, the men stayed in the vehicle. A meeting conducted in a vehicle in a parking lot under cover of night when it is very cold out is

---

[3] Defendant points out that, at this time, Detective Nordstrom had not seen Privette inside the Infiniti. Nevertheless, Detective Nordstrom reasonably believed Privette was inside the Infiniti based on several factors. First, the Infiniti bore a license plate that detective Nordstrom knew was registered to Privette's girlfriend. Second, Detective Nordstrom had observed Privette driving a Cadillac owned by Privette's girlfriend bearing the same license plate. Thus, it would be reasonable to believe the driver of the Infiniti was either Privette or Archie. Third, Detective Nordstrom testified at hearing that from his viewpoint, he believed a male was driving the Infiniti. See Tr. Suppression Hr'g 46-47.

6

somewhat unusual and could properly contribute to a reasonable suspicion of criminal activity.

Thus, where reasonable suspicion of Privette would necessarily also envelope defendant in this case, the court turns to consider whether officers possessed "'a reasonable and articulable suspicion that [Privette was] engaged in criminal activity.'" Black, 707 F.3d at 539 (4th Cir. 2013) (quoting Reid, 448 U.S. at 440 (1980)). Defendant asserts that officers did not have a reasonable suspicion that Privette was engaged in criminal activity arguing, first, that the area in which the seizure took place could not support a reasonable and articulable suspicion, and second, that the tips received were inadequate to support such a suspicion.

As to the location of the seizure, while such a factor alone is insufficient to establish reasonable suspicion, it nevertheless may be a factor supporting a reasonable suspicion. United States v. Hernandez-Mendez, 626 F.3d 203, 208 (4th Cir. 2010). Detective Nordstrom clearly testified that the area of Hylton Drive where Privette and defendant were detained was a high crime area. Defendant nevertheless contends that Detective Nordstrom "had no experience or evidence to support that statement" because he had not responded there as a patrol officer for drug activity. See Def's. Objections to M&R 4; Tr. Suppression Hr'g 40. However, Detective Nordstrom immediately went on to testify that he "responded there when [he] was on [the RPD's] fugitive unit and located several fugitives in that apartment complex." Tr. Suppression Hr'g 40. Most of the fugitives for whom he responded to that apartment complex were wanted for arrest for violent crimes. Id. Thus, Detective Nordstrom had a basis for testifying that the location of the seizure was in a high crime area, and the court will not disturb this finding in the M&R.

Defendant next asserts that the information police received from an anonymous tipster and confidential source were insufficient to support a reasonable and articulable suspicion. Defendant

7

is correct in stating that an uncorroborated anonymous tip is generally insufficient to support a reasonable suspicion.  See Florida v. J.L., 529 U.S. 266, 270 (2000) (instructing that when an anonymous tip is "suitably corroborated" it may provide reasonable suspicion to make an investigatory stop).  In J.L., the Supreme Court held that an anonymous tip that a juvenile was carrying a firearm, although it accurately described a particular individual's clothing and location, failed to support a reasonable suspicion where it did not provide police with any basis for the tipster's belief the juvenile was carrying a firearm, nor did it provide any predictive information by which the police could test the reliability of that tip.  Id. at 271-72.

But while predictive information may provide a valuable means to determine the reliability of an anonymous tip, it is not necessarily a requirement.  Rather, whether a tip may support a reasonable suspicion should be determined by the totality of the circumstances.  Illinois v. Gates, 462 U.S. 213, 238 (1983).  The Court noted that anonymous tips, "particularly when supplemented by independent police investigation" may be a valuable contribution to solving crimes.  Id. at 237-38.

The instant case does not present a situation in which police relied solely on an anonymous tip devoid of any information upon which police could determine its reliability.  Instead, Detective Nordstrom received an anonymous tip asserting that Privette was dealing drugs on Idlewild Avenue.  This tip was corroborated in part when a cocaine dealer was followed back to a residence on Idlewild Aveune where Privette was found and admitted smoking marijuana.  Police also found there the car described in the anonymous tip, a small stash of marijuana, and aggressive dogs which prevented them from searching in dog houses that could also have contained contraband.  Police received an additional tip from a confidential source – whom police were able to verify knew

8

Privette – stating that 3924 Hylton was possibly a stash location for Privette's drugs. Based upon all of this information, as well as his knowledge of Privette's long involvement with criminal activity, including drug activity, Detective Nordstrom went to 3924 Hylton in hopes of surveilling Privette. Eventually, an individual who – for reasons stated above – Detective Nordstrom reasonably believed was Privette arrived, and Detective Nordstrom watched him wait in his car in the cold night for some time before defendant arrived and entered Privette's vehicle. It was only thereafter that the stop was made, and it was supported by more than the tips received.

Ultimately, the factors supporting the detention of Privette and defendant include, without limitation: (1) Privette's extensive criminal history; (2) the information Detective Nordstrom received regarding Privette's drug-dealing activities from the anonymous tipster and the confidential source; (3) the corroboration of the tips indicating that Privette was involved in dealing drugs obtained when Detective Nordstrom found Privette smoking marijuana at the house on Idlewild Avenue with the car described parked out in front, and the marijuana found within the residence; (4) the Infiniti bore the tags that previously had been on the Eldorado and Detective Nordstrom knew drug dealers frequently switch vehicles to avoid detection; (5) Privette and defendant were in a high-crime area; (6) Privette waited alone in his vehicle for twenty (20) minutes after arriving despite it being a cold night; (7) when defendant arrived, he parked sloppily, leaving his engine running and lights on, suggesting a brief encounter; (8) defendant and Privette stayed in Privette's car in the cold and dark night; and (9) the possibility that this encounter was taking place near where Privette stashed drugs. Taken together, all of these facts strongly suggested that illegal activity, such as a drug transaction, was taking place. See Hernandez-Mendez, 626 F.3d at 208 (location in a high crime area may contribute to a reasonable suspicion of criminal activity); United States v. Perkins,

9

363 F.3d 317, 321 (4th Cir. 2004) ("[F]actors which by themselves suggest only innocent conduct may amount to reasonable suspicion when taken together. Moreover, our determination of reasonable suspicion must give due weight to common sense judgments reached by officers in light of their experience and training." (citations omitted)); Sprinkle, 106 F.3d at 617 (4th Cir. 1997) ("[A]n officer can couple knowledge of prior criminal involvement with more concrete factors in reaching a reasonable suspicion of current criminal activity.").

Defendant notes that police did not corroborate the confidential source's tip that drugs were stashed near 3924 Hylton. However, this tip did not form the sole ground for the stop of Privette and defendant, rather it is only a small part of the totality of the circumstances known to police. Looking at the totality of the circumstances, the court concludes that the stop was supported by reasonable suspicion and, therefore, that the investigative detention of Privette and defendant was legal.

Defendant, however, contends that the facts of this case are squarely analogous to those in the Sprinkle case. In that case, Officer Riccio – a police officer in Charleston, South Carolina – saw his mother's stepbrother, Poindexter, parked across the street in a high-crime area. Id. at 615-16. Officer Riccio knew that Poindexter had recently been released from prison. Id. at 615. Officer Riccio then observed Sprinkle walk out of a house and enter Poindexter's car, and saw the two huddled together talking. Id. at 616. When Poindexter saw Officer Riccio, he moved as if to conceal his face from Officer Riccio. Id. As he approached the car, Officer Riccio could see Poindexter's and Sprinkle's hands, but could see nothing in them, nor could he see "any drugs, money, guns, or drug paraphernalia in the car." Id. Based upon these observations, Officer Riccio and his partner stopped Poindexter and Sprinkle. Id. The Fourth Circuit held that these facts were

10

insufficient to support a reasonable suspicion of wrongdoing. Id. at 618-19.

As noted in the M&R, however, Sprinkle is distinguishable from the instant case. Unlike in Sprinkle, the meeting between Privette and defendant took place not during a sunny day, but during a very cold night. As discussed above, officers also had some suspicion that Privette was close to his drug stash. Furthermore, Privette was the subject of an ongoing investigation which had already yielded evidence of drug crime. Finally, and quite importantly, in Sprinkle, unlike in this case, the police were actually able to see that no illegal activity was occurring. Thus, the facts of this case present far stronger factors supporting Detective Nordstrom's reasonable suspicion. Accordingly defendant's objections to the M&R are overruled, and his motion to suppress is denied.

## CONCLUSION

Upon *de novo* review of those portions of the magistrate judge's M&R to which specific objections have been filed, and upon considered review of those portions of the M&R to which no such objection has been made, the court overrules defendants' objections, and ADOPTS the findings and recommendations of the magistrate judge. Accordingly, defendant's motion to suppress (DE 21) is DENIED.

SO ORDERED, this 28th day of May, 2014.

_____
LOUISE W. FLANAGAN
United States District Judge